## Louisville & Nashville Railroad Company v. Stewart's Administratrix.

(Decided December 19, 1913).

### Appeal from Warren Circuit Court.

1.  Negligence—Pleading—Action for Personal Injury.—A general charge of negligence is good in a personal injury action in this State, and this rule has not been changed by the Employers' Liability Act when the action is in the State courts.

2.  Railroads—Negligence.—A flagman whose duty it was to protect the rear end of the train, was not guilty of negligence in putting on the emergency from the rear of the train when it was about to back from a siding through a switch that was locked whereby injury might be done to property and cars derailed; the flagman not having time to unlock and throw the switch.

3.  Railroads—Negligence.—A conductor whose train is on a siding and which is too long to be "in the clear" of the main track at both ends, is guilty of negligence in giving an order to back up

when he knows by so doing he will run the rear of the train into a closed switch, and injure property and derail cars.

4.  Railroads—Measure of Recovery in Action for Death.—The measure of recovery in a case for damages for death, is such sum as will compensate his estate for the destruction of his power to earn money; and in arriving at what that sum is the jury may consider all the evidence bearing on that issue.

BENJAMIN D. WARFIELD and SIMS & RODES for appellant.

WRIGHT & McELROY and HAZELRIGG & HAZELRIGG for appellee.

OPINION OF THE COURT BY JUDGE TURNER—Reversing.

On September 5th, 1908, William H. Stewart, an engineer employed by appellant, while running a train from Paris, Tenn., to Bowling Green, Ky., was injured, and as result thereof died twenty-two days later from inflammation of the brain. Thereafter his wife qualified as administratrix, and instituted this action as personal representative seeking damages under the Employers' Liability Act of April, 1908. The jury returned a verdict for $20,000, and from a judgment on that verdict this appeal is prosecuted.

Upon the occasion in question the train was coming north from Paris, Tenn., towards Bowling Green, Ky.; when it reached Cumberland City, Tenn., it met a southbound freight train, and accordingly, the northbound train went in on the single switch which was at that point, so that the freight train might proceed south; but there was also due at that point a southbound passenger train in a short time, and Stewart's train had to wait there until it also went South. Stewart's train had to clear the main track first to let the freight train proceed south, and later to permit the passenger train to pass. Stewart's freight train was a long train, and there were several cars standing on the side-track when his train went in on it. The cars so standing were coupled to the engine and pushed ahead of the engine on the side-track as it proceeded north; when the freight train had gone far enough north to clear the main track at the south end of the switch to enable the freight train standing on the main track to pass south, the cars so pushed ahead of the engine on the side-track were either on the main track at the north end of the switch or so close to the main track as to foul it, or not to be "in the clear" of the main track upon which the passenger train which

was shortly expected from the North must pass; the flagman in charge of the rear-end of the train, after his train was on the switch, threw the switch and locked it, as it was his duty to do, so that not only the freight train but the expected passenger train might proceed South. After the freight train had gone South the conductor, who was up near the engine and cars near the north end of the switch, signaled the engineer to back his train, evidently with the purpose of leaving the north end of the switch clear so that the passenger train might pass; a flagman had already been sent out to flag the approaching passenger train to the North.

There were three crossings going over the side-track, one very near the south end of the switch, and the other two were blocked by the standing freight train; it was the duty of the company to keep these crossings open, and the rear flagman as soon as he had closed the switch started up to the middle crossing to see if anybody wanted to get through, and if necessary to open it; but before he reached the middle crossing the conductor up at the front of the train gave the engineer a signal to back his train, and this he proceeded to do; the rear flagman, whose duty it was not only to keep the crossings open, but to throw the switch at the south end so that the switch would not be split, and to avoid a possible derailment of cars, immediately started back while the train was moving for the purpose of throwing the switch; but when he reached the rear of the train, doubting whether he had time to unlock and throw the switch before the caboose reached it, he put on the emergency air-brake from the rear of the train called an angle-cock, and stopped the train before the caboose reached the switch, and just about where it fouled the main track. The putting on the emergency in this way from the rear had the effect to immediately stop the whole train, and cause a considerable jerk or jar, and it is claimed by the plaintiff that this jerk or jar threw him up against the side of the cab of the engine and bruised his shoulder and injured his head in such a way as resulted in his death.

The crew of the train consisted of five men, Jones, the conductor; Stewart, the engineer; Minor, the brakeman at the front of the train, and Hill, the flagman at the rear of the train, and Sorrels, the fireman.

Jones, the conductor, did not testify upon the trial, but we have the testimony of Minor, Hill and Sorrels.

The testimony is that the siding was not long enough to hold Stewart's train and the cars which were already on it, and at the same time be clear of the main track at both ends, so that it was necessary to back his train till he cleared the main track at the north end of the switch so that the passenger, a much shorter train, could pull down the main track and stop clear of the north end of the switch till the freight train could pull up north so as to clear the main track at the South end; in other words as expressed by railroad men, they had to "saw-by." Sorrels, the fireman, testified that the conductor gave Stewart the signal, and the engineer gave three blasts of the whistle, and then started back slowly, and while so backing slowly and after the train had backed a short distance the flagman, Hill, put on the emergency application of the air-brake at the rear and stopped the train suddenly, and that the jar threw Stewart up against the window and Stewart claimed immediately afterwards that it had hurt his head and shoulder; that the jar was neither hard nor soft, but medium.

Minor states that the emergency application caused a "right smart" jar, that it stopped every car including the engine at once, and that such an application might endanger some part of the train, or might result in injuries to persons around or on the train.

Hill, the rear flagman who applied the air, testified that he applied it for the purpose of preventing the train "from splitting the switch," and possibly derailing one or more cars; that he did not apply the brakes for the purpose of "bunching the slack," although its application did have that effect, and did have the effect to keep the rear end of the train from going on the main track at the south end of the switch. He testified that after the train had pulled on to the side-track from the main track he threw the switch and locked it; that it was his duty then to go to the middle crossing which was blocked by the freight train to see if any one wanted to get by, and to cut the train if necessary and let them by; and after he had locked the switch he started to the middle crossing which was from four to six hundred feet distant from the lower crossing near where the caboose stopped; that he had gone about one-third of the way when the train began to back, and he immediately hastened back towards the rear of the train, and thinking he did not have time to unlock and throw the switch before the train got to the main track, he put on the emer-

gency from the rear and stopped the caboose before it reached the main track and about at a point where it would foul the main track.

Two rules of the company were introduced in evidence as follows:

No. 1.—"The emergency or quick action must never be used unless it is to avoid injury to life or property. No excuse will be taken for its use except as stated. The necessity for its use can be readily avoided by returning the handle to lap immediately after the release of the first application, and then applying the brakes lightly before the engine reached the exact spot."

It was shown, however, that the latter sentence had no application where the air is applied from the rear of the train.

The other rule introduced was as follows:

No. 2.—"A train about to enter or leave a siding must come to a full stop before the switch is thrown, and no signal must be given to start the train until the switch is turned and the lock is secured through the hasp. No attempt should be made to close a switch until the last wheels are off the switch rails. The person who locks a switch must grasp the chain and pull the lock and see that it is securely fastened, and after having done so, must look twice at the switch rails to see that they are in their proper position. At meeting or passing points the employee attending the switch will, after locking it to main track, take a position not nearer than ten feet from the switch until the expected train has passed."

The petition charged in general terms that the death of Stewart was brought about by the negligence of the agents and employees of defendant, but does not specify in detail the negligence complained of; it is urged by appellant that the demurrer to the petition should have been sustained because the plaintiff was proceeding under a Federal statute and should have been required to set up with particularity the acts of negligence complained of as he would have been required to do in the Federal court; but the act of Congress does not undertake to prescribe the mode of procedure where the action is pending in the State courts except in certain particulars not here involved. So that the general allegation of negligence being held sufficient in this State prior to the enactment of the Employers' Liability Act, such a

plea will be held good even when proceeding under that act.

It is urgently insisted for appellant that it was entitled to a peremptory instruction. We have given above the substance of the evidence, and must say that so far as the evidence shows any negligence upon the part of Hill, the rear flagman, that appellant's contention should have been sustained. It was Hill's duty to lock the switch at the south end of the siding just as he did. Under one of the rules quoted it was his duty to remain near that switch until the expected train had passed on the main track, but he was relieved from that duty by the further imperative duty which devolved upon him of seeing that the middle crossing was kept open for traffic; it was the duty of the company under the laws of Tennessee to keep those crossings open, and Hill immediately after closing the switch proceeded to the performance of this latter duty, and before he could get to the middle crossing the train began to back, and he knowing that the switch was closed immediately ran back towards the rear of the train, but finding he did not have time to unlock and throw the switch in order to prevent the "splitting of the switch" and possibly the derailment of some of the cars, and consequent delay in traffic which would have resulted therefrom, he did the only thing which he could reasonably have done, and that was to apply the emergency air-brake by angle-cock; and it is doubtful from the evidence whether he then applied it in time to prevent the freight train from fouling the main track.

But, the conductor was guilty of negligence; he gave the order to back the train when he knew or should have known that the switch at the south end of the siding was locked; he knew or should have known that the rear flagman, after locking that switch, had to see to the keeping open of the middle crossing, and, therefore, knew or should have known that the flagman was not at the switch when he gave that order to back, and that if the rear end of the train backed on to the main track at the south end of the switch it would split the switch and possibly derail some cars and delay traffic. He knew that under the rule above quoted that the train before entering or leaving a siding must come to a full stop before the switch is thrown, and that until the switch is thrown and the lock secured no signal must be given for starting. The

conductor knew that his train was too long for that siding to be "in the clear" of the main track at both ends; he necessarily knew that when he backed that train so as to clear the main track at the north end of the switch that it would probably run out on the main track at the south end, and before giving that order he should have known either that the switch was open or that the flagman was there to open it. The front flagman had been sent ahead to flag the approaching passenger train, and there was no such emergency existing to clear the north end of the switch as justified him in giving the order to back until he knew that the switch at the south end was open or that the flagman was there for the purpose of opening it. For these reasons the motion for a peremptory instruction was properly overruled.

But the instructions of the court were radically wrong in several particulars. The correct measure of damages in such cases has been so often pointed out by this court that it would seem unnecessary to cite authority; but in this case in the first instruction the plaintiff is permitted to recover such a sum as will fairly compensate his estate for his death. Instructions similar to that have been frequently condemned upon the idea that it might authorize the jury to consider mental anguish, and loss of companionship, and so on. The true measure of damages is that sum that will compensate his estate for the destruction of his power to earn money. On another trial of the case the second instruction which deals alone with the negligence of Hill, the flagman, if the evidence is the same, will under our view of the case probably be eliminated, and for that reason we will not consider it. Instruction No. 3 is erroneous for the same reason as instruction No. 1; it should have been in substance that the measure of recovery is such sum as will compensate his estate for the destruction of his power to earn money, and that the jury may in arriving at this amount consider all the evidence in the case bearing upon this question. Instruction No. 4 should be given on a new trial in conformity with the rule laid down in Nashville, Chattanooga, St. Louis Railroad Company v. Banks, this day decided. 156 Ky., 609.

The court will also upon the return of the case give such instructions to the jury as will apportion the ultimate recovery, if any, between the beneficiaries as is suggested by the Supreme Court in the case of Gulf, Colorado, &c., Ry. Co. v. McGinnis, 228 U. S., 173.

For the reasons indicated the judgment is reversed, with directions to grant appellant a new trial and for further proceedings consistent herewith.